Good morning and may it please the court. My name is Press Millen. I represent the plaintiff appellant, Baer CropScience Limited Partnership, which I'll refer to as Baer. I'm here with my colleague, Mr. Sam Hartzell, this morning. The sales agreement in this case has two attributes which are critical, I think, to understanding the basis for this appeal. First, it is a contract with an open price term, providing that the seller, Albemarle, has discretion to set pricing for the good at issue methyl bromide, in this case, on a quarter-by-quarter basis. In addition to that, it is a so-called requirements contract, in which Baer is committed to take 100% of its requirements for methyl bromide from Albemarle, with an exception for 20% if Baer can find a lower price that Albemarle won't meet. Now, at common law, this is a UCC case, but at common law, contracts with either of those attributes were not enforced by reason of indefiniteness, in other words, the lack of a price term or a quantity term. The UCC, in derogation of the common law, will enforce those contracts, but does so by explicitly recognizing and adding to the contract an implied requirement of good faith and fair dealing in order to avoid abuses. So, at its core, what this case is really about is whether the UCC means what it says and requires parties to fulfill their duty of good faith and fair dealing. If the UCC doesn't mean what it says, or if it doesn't apply to sophisticated parties, the net effect will be that parties will not be willing to enter into open price term agreements. The issue is not whether courts will have to police every agreement. This is Judge Shedd. This is Judge Shedd. Do you think the question of good faith arises in the major increase that, you know, there's a commentary about the increased pass-through, is that it? That's part of it, Your Honor. We think that there are... Is that the transaction you want to focus on as far as whether or not that was a breach of the contract at that point, I'm asking? We believe it's a breach at that point. In other words, Your Honor, when the price was raised to $4.09 in the first quarter, we also believe, and we'll get to this in a moment, that the additional price increases following up on that to $8.49 and $11.09 also do, but that gets to the issue of the prior material breach, which I'll discuss. Let's talk. You want to talk about that first price increase? Yes. The question... I'm just going to lay this out for how I'm looking at it. You tell me how I'm wrong about this, or answer the question for me. The price has to be a commercially reasonable price, correct? Yes. And if the price is commercially reasonable, under Virginia law, does subjective intent matter? Yes. In other words, if the price is commercially reasonable, does it even matter what anybody did or said about setting that price? Oh, in other words, if I understand your question, your question is, if the price is otherwise commercially reasonable, the circumstances in which, for example, it was conveyed matter? No, no, I think I've stated it clearly enough. If the price that's set is commercially reasonable, does any motivation or misstatement about that price, does it matter under Virginia law, and is Virginia law decided on that point? I do not believe that Virginia law is necessarily decided on that point. I think what the UCC requires, and this is the requirement that is in 23053, it comes via 2103b1, is that there must be honesty in fact. It's a two-part inquiry. They use the word and. Honesty in fact and commercial reasonableness within the law. But Virginia, I can't find that Virginia has decided the interplay between those two, if in fact the price is just commercially reasonable. And Virginia hadn't decided that, had they? I do not believe Virginia has decided that, and so when we look, for example, to this court's decision in the Havrid case, which was one of the. In that transaction, what is your evidence of lack of good faith? Our evidence of lack of good faith with respect to the first price increase, in other words, the price increase that was initiated in March of 2014 from $1.81 per pound to $4.09 per pound. Our evidence with respect to that is, number one, with respect to honesty in fact, that there was told by Albemarle that the price increase represented a 100% pass-through of its increased tolling fee. That was not correct. I don't think the record supports that statement you're making. Is that from the telephone conversation? Yes, Your Honor. At page 259 of the appendix? I believe that may be the case, Your Honor. It is, it is. Okay. The question, listen to the question. The question from Mark, I know you know who that is. A question from my side. The increase being passed through, is that purely as a result of the increase in tolling fee? Is that what you're saying is a dishonest representation? I think that the statement that comes back, which is to say it's a 100% pass-through and in no way opportunistic or punitive, was a false statement. Is that true about the increase being passed through? What if the increase being passed through is the tolling fee increase? That was what was... In other words, there's an increase being passed through. We're adding money on top of that. You ask Mark about the increase that is being passed through, not the increase in price. I did not read it that way, Your Honor, and I don't believe that's the way it was understood. I read it that way, and it seems to me that leaves an opening that it is not as clear as you say it is. Well, again, Your Honor, I think that that is potentially a disputed fact here, which is you have them saying... You have the question, is this just based on your tolling fee? Because we know what happened. The tolling fee went up 95 cents. No, no, no, no, no, no, no, no. You're going too far afield now. Your argument is, I take it, you're making it, but I take it you're making it, that the increase being passed through, you think that's subject to two reasonable inferences. At least you're entitled to that. I believe the way to read that is what you are seeing here, what is being passed on to you here. No, no, no, but you can't. No. In your argument on that point, that you think you're entitled... Because I read it in a way that doesn't comport with the way that you read it, but I think, wouldn't you suggest... I'm just asking that at least you're entitled to the reasonable inference that he's talking about, the total increase, rather than just the increase passed through. I believe that's right, Your Honor, yes. And you think then that would create a question of honesty in fact? I believe it does, Your Honor. As to the price setting? Yes. And then you think, why shouldn't we ask the Virginia Supreme Court what they think about honesty in fact, within a price that, as you stated, is otherwise commercially reasonable? Well, I don't believe it's otherwise commercially reasonable, Your Honor. Okay. Why is that? What other evidence do you have that it's not commercially reasonable? Well, we have the issue... So they put forth a rationale for the price increase, the official one that's put forth by Albemarle. What this represents is something called value-in-use pricing. What we have disputed on the record is the internal deliberations of Albemarle that indicate instead that they understood that they had a vast amount of leverage against Bayer, that they were instructing the employees to use that infinite leverage to extract as much profit from Bayer as possible, and third, that they were told to treat this as a cash-out business and get everything you can out of it as soon as possible. The court ignored that evidence. I would analogize this to a situation... Let me say that. Nothing that you said means the price they finally set is commercially unreasonable. You can think all of that. You could think all of that in a completely reasonable price setting. You could. I guess it's not inconceivable, Your Honor, but this is where the issue of the toller, the producer of this, Chemtura, comes in. And I think that that can't be ignored here, and I think it's a critical point. You have to understand this point, Your Honor. Here, the role of Chemtura. The district court called Chemtura Alomar's sole competitor, but that's not exactly right. The facts are that Chemtura, and I think has to be considered in the context of commercial reasonableness here, in the U.S. there are two sellers of methyl bromide, Alomar and Chemtura, but only one producer, and the producer was Chemtura, who sold to both Alomar and Bayer. Wait, wait, wait, wait. Why was the district court wrong to say that the competitor was Chemtura? That's who you went to to get. That's who you went to for your alternate source, isn't it? That's an indication that they're solely a competitor. In fact, they are the sole producer for both parties. Wait, wait, wait. You could be both. You could be a producer for a party and their only competitor. Couldn't you? That argument, that no, no, no, do you have to win the argument you're making right now that the judge was wrong calling Chemtura the only, and why are you wasting your time making it, because I don't think it's true. Well, here's the critical issue. While Alomar was increasing its price to Bayer from $1.85 to $4.09 to $11.04 over the course of 12 months, Chemtura, the sole producer, was selling to Bayer for less than $2.50 a pound the entire period. So when the district court said there's no fair market price with which to compare the price that Alomar sold to Bayer, that's not really accurate because we have Chemtura, the sole producer, as a point of comparison. And if the sole producer is willing to sell for $2.50 a pound, the only thing that can account for Alomar's ability to sell at the higher rates as a middleman selling Chemtura-produced methyl bromide is the leverage provided by the contractual pricing discretion and their willingness to abuse that leverage by acting in a commercially unreasonable manner. That's not correct. That's not correct. It may be the value of the brand of the other seller. It may be the goodwill. It may be the relationship between the parties. If you go to a shoe store, you can buy the same tennis shoe that maybe Nike's making for them for $10, $15, and it costs you $80 to buy it in Nike, and it might be the same tennis shoe. But people do it. People do it because they want to deal with the Nike brand, the assurance they get from that. So I don't think that as a matter of law, that's certainly right, what you're saying about what the other competitor is. But if you were right on some of those issues, would that just make it a question for the jury, do you think? You think you win as a matter of law? No, I think it's a question for the jury, and I think there are disputed facts here with respect to that. I think there are disputed facts about the timing in which this was made. I think there are disputed facts about the commercial reasonableness, because the person who set this price was asked if he considered commercial reasonableness in the context of setting the price, and he specifically said he was not. I think there are disputed facts with respect to the concealment and misrepresentation, which I think can be read that way and certainly could be inferred that way. Let me say to my colleagues, I find this to be a pretty complicated case on a number of points, and I've taken up all the time. I'm going to back up and let you all ask some questions. But there is one other whole big category I want to talk about, and I'll raise it either later or with the other side. There is another category dealing with Virginia law on suit on damages after there's a material breach. So I'll be glad to defer. I'll be glad to say what you want me to say. Judge, we've taken your request under consideration, and granted, you can proceed with your questions now. We just do not need to ask the question now. Okay. I want to go to the next big group for me, which is the question of suing after material breach. As I read the law in Virginia, do you think the law in Virginia is settled on the point of whether or not there may be a subsequent suit for a contract breach, some type of contract breach, after a material breach? Your Honor, I see that my time is expiring right now, if I could answer that question. Absolutely. Go ahead. Thank you, Your Honor. What I would say with respect to that, Your Honor, is … It starts with the yes or no. The answer is, I believe that there could be a suit after a prior material breach. I do not believe that there is a prior material breach established. I didn't ask you that. Wait. I didn't ask you that. I didn't ask you that. Understood. I didn't get into that. But the law in Virginia, in this case, people are citing it as, and the district court read it as, I think, there could be no suit for a breach of contract after a party has materially breached. But those cases seem to be a suit for non-performance, a suit for non-performance after a material breach. I believe that's correct. Has Virginia made that clear yet? I believe that when one reads the Virginia cases, that what you see there is essentially, when a statement is made concerning prior material breach and the ability … No, let me ask you. Just answer my question. Do you think the Virginia courts have made it clear about anything other than a non-performance type suit after material breach? No, I do not believe that that's clear. However, in this case, I think the circumstances where you have the parties continuing to deal with one another, even if there were a prior material breach, which, as I've said, we certainly don't concede, even if there were, the idea that one could continue to perform over the course of the next 16 or 17 months with one party locked into performance and the other party having all of its duties evaporate as a result of the prior material breach. Wait, wait, wait. Might it be that the Virginia courts would see some kind of quasi-contract remedy like unjust enrichment? Do you think that's wherein the Virginia court makes such a broad statement? Or do you think some people are just reading that Virginia law too broadly? And the third part of that is, why shouldn't we certify that too? Three-part question. Number one, as I understand it, I don't think that the quasi-contract is the way they would look at it. They might look at it as a ratification. In other words, a willingness to go forward with the same contract. So that's number one. Number two, with respect to the reading too broadly, I think if the Horton case, which was a case about one specific breach, whether the ex-wife was required to sign a document, to read that to say that in the hypothetical... So you think maybe some people are reading that and the district court read that too broadly? I believe so, Your Honor. And if the only way to determine whether the district court read that too broadly, and I think it can be determined from within the four corners of the Horton case and the way the other cases have dealt with the breach, but if that requires... You've answered my question. I'm sorry. Can I ask you a question? Yes. Because I think that all of my friend Judge Shedd's questions go to suggesting that certification here would be appropriate. Do you have a view on that? You haven't asked for certification. We have not asked for certification. I think that this court can read these Virginia cases to indicate that the prior material breach doctrine does not apply here. So you don't think certification is necessary? I don't think it's necessary, but if the court thinks it's necessary, we certainly can participate in that process. You are the plaintiff, right? We are, Your Honor. You went into federal court, right? No, Your Honor. We began this case in state court and it was removed to federal court. It was removed to federal court. Yes, Your Honor. All right. Thank you. Thank you, Mr. Millen. Cox. Good morning, Your Honors. May it please the Court. I'm Stephen Cox representing the appellee in this case. You might begin with how you feel about certification. I think the case's judgments give the court enough guidance here to answer these questions without certification. So it's not necessary? I don't believe it's necessary, Your Honor. I don't have a particularly strong view on that, but I think the case law that we've cited in our briefs and discussed make it possible to decide this without certification. Just to finish my introduction, I'll also introduce my co-counsel and law partner. That's just fine, Judge. My co-counsel and law partner, David Kimball. Broadly speaking, BEHR has challenged three aspects of this commercial course of dealing between these parties. One is the motive of Albemarle in setting the price at the end of 13 and 14 as evidenced in these infinite leverage emails. One is the actual fixing of the price itself at $4.09 a pound in the beginning of 2014. And one is the explanation for the price in this phone call that was held in March of 2014 between Westwear and a couple of buyer representatives. So we've got pre-price fixing motive, we've got the price fixing itself, and we've got post-price fixing explanation. And I would submit to Your Honors that what 2305, the critical UCC statute, is preeminently concerned with is the middle of those acts, the fixing of the price. 2305 doesn't say that the seller must explain the price in good faith. It says that he must fix the price in good faith. So to pick up on a question Judge Shedd asked Mr. Millen a few moments ago, what's the evidence that the actual fixing of the price in good faith was fixed in bad faith? And as I understand BEHR's position and Mr. Millen's answer, it's basically twofold. First of all, it's just too high. And secondly, Kim Tura, the only other provider in the market, was charging a lot less. But Your Honors, I would refer you to the record evidence, the testimony of Mr. Hemant Khandor, the purchasing manager for BEHR with overall responsibility for this contract on BEHR's behalf. You don't dispute. You do not dispute though, do you, that statements made after price fixing can be relevant to the question of price fixing. You can't possibly dispute that. They may have some relevance, but I would suggest... No, no, wait, wait, wait. You can't possibly dispute that...this is to my question. Statements made after price determination, I don't want to say fixing, price determination, they absolutely may be relevant to the question of how the price was set. Yes, Your Honor, I agree with that. I agree with that. Okay. No question about that. But to get back to Mr. Khandor... I don't understand how you came to these two. Of course the statements are relevant. You tried to exclude them when you laid out your two factors. A, the price was too high, and then you were getting into B. No, ma'am. But B wasn't those statements. Okay. But they are relevant now you're telling us. So there's C. No, ma'am. What I was trying to do, and I apologize if I wasn't clear. What I was trying to do is focus first on the act by which the price was fixed. I will certainly get to the conversation that was held thereafter. But I want to focus first of all on what is the evidence that the price was commercially unreasonable in its fixing. But I thought I understood Judge Shedd's question, and it was not his question, it was mine. Those statements, even any statements, even if they're after the fact, if they're talking about the intent that took place in the past, are relevant. Well, I'm not sure I... I thought your answer was yes, they're relevant, and I'm getting to them. Let me be clear. They may be relevant in some sense, but to the extent they illuminate intent or motive, I don't think those considerations of intent or motive under the better reason cases... Okay. Suppose I throw down this book and throw it at you. I don't say anything. And then two weeks later I'm deposed, and I say my intent was to hit his head. Are you telling me that that statement would not be relevant to what my intent was when I threw the book at you? It would be relevant to what your intent was, but your intent, your intent, your motive in throwing at me... Okay, so now say I said to you, your charge here is $50 to come into the Fourth Circuit and make this argument today. I say that to you, you pay the $50. Two weeks later you take my deposition and you say, what was your intent? My intent was to get $50 for myself. That would not be relevant to what my intent was in setting that price? It is relevant. It's exactly relevant to what your intent is. Let me give an example from this case. All right. Well, then why aren't those statements relevant? Because let's say Mr. Ware had said, I charge $4.09 a pound. He did. And he said my intent in doing that was to make a lot of money. I want to make a lot of money. I want to make profit. And what the courts, I think, have said in these cases is whether he intends to make what the better reason cases have said I would submit, whether he intends to make a lot of money or not, what his motive is in setting the price is not evidence of good faith. What matters is, is the price itself commercially reasonable? Not what someone's motive was. Well, that's not what the UCC says, is it? I believe that's what 2305 says. 2305 says a price to be fixed is a price to be fixed in good faith. So what is the evidence that the price was fixed in bad faith? That is, was it arbitrary? Was it commercially reasonable? And the UCC defines good faith. In 103 or 2203? 103. Honesty in fact, observance of reasonable commercial standards of fair dealing in the trade? Yes, ma'am. And when the HRN court, the Texas Supreme Court, considered what the interplay was between that honesty in fact standard and the specific context of fixing a price, the Texas Supreme Court adopted a very narrow standard and said we're not going to Wait, wait, wait, but isn't there a split on that? There is most definitely a split on that. You like what Texas did because you believe this, you're arguing this to us, which I frame the question and I put it on the table. If the price is in fact commercially reasonable, why does any of it even matter? It doesn't. Why does anything else even matter? It doesn't. You say it doesn't, but it hinges on that honesty in fact and whether we follow Texas or what Virginia does. Virginia, is not that? Don't we have to look at what Virginia does? Don't we have to look at what Virginia does? Yes, sir. It's a diversity case. Virginia law governs. Has Virginia decided that expressly? Not squarely. But when I answered Judge Motz's question at the beginning of my argument, in the American trading case, it was not a UCC case, mindfully, it was a sewer service case, but in the American trading case, the court discussed the 2305 sales contract provisions and basically said the limitations are only that the seller not act arbitrarily or discriminatorily. And that's entirely in line with the Casserly case and the HRN case that we cited in our brief. I do want to try to get this out, if I may, when I was starting about what shows that this price is commercially unreasonable. I'm happy to have you do that. And I won't ask you another question. Yes, ma'am. But I would just suggest to you that what you might be interested in is what the court's interested in. Of course. Yes, ma'am. So you go right ahead. Well, if you had a question, I want to answer that first. No, I wanted to get it out. You go. Okay. I apologize, Your Honor. I was just going to say that when Mr. Millon says that Kentora, because their price was so low, that's somehow evidence that we were being commercially unreasonable, their own purchasing manager and 30B6 witness, Hemant Kanwar, admitted in his deposition, these are pages 179 and 80 of the record, that he didn't know whether Kentora's price was too low. And furthermore, he didn't know what an appropriate price would be for Albemarle to charge to reflect its expertise. That's the only point I want to make. So what it really boils down to is once you consider that testimony, the only evidence they have that the price itself was fixed, it was commercially unreasonable, is that it was just too high. And 2305 does not protect a seller from a price that is too high. No, no, that's not correct, I don't think. They at least assert that Virginia would look at honesty and fact, and that the telephone conversation, they say, is evidence that there was not honesty in fact, because your client wasn't truthful about the increase. They do say that. I would say two things to that. First of all, the explanation of the price after the fact doesn't show that it was commercially unreasonable to begin with, only perhaps that it was explained. Wait, wait, wait, but we've been through some of that. We've been through some of that. And furthermore, they've admitted they didn't believe the telephone conversation anyway. So that can't possibly be a breach if they didn't believe it anyway. And finally, Judge Shedd, as you pointed out to Mr. Millen, I think our position on the telephone conversation is that it was not deceptive, that he was actually saying it was a cost pass-through. Well, that's a disputed as to fact. But we'll take one thing, they take another. That's correct, Your Honor. Now, what's not disputed as to fact, though, is that they didn't believe it to begin with. That's acknowledged. And there can be no breach if there's no reliance because they didn't believe it to begin with. Well, well, no, no. Where is the evidence in the record about that? Just if you could give me a J.A. reference. Again, Mr. Conner, when we deposed him, I had this. Can you give me a J.A. reference? Yes, ma'am, I'm looking for it. Now, I won't take up your time. No, ma'am, I'm certainly looking for it. I'm trying to find it right now. Mr. Kimball will help me out, I'm sure. Okay, well, maybe he can find it and you can go forward. Right, but the reliance on that statement, that's the unfair trade practice. That's the unfair trade practice is reliance on that statement. Why does there have to be reliance on that statement on the question of honesty and fact? I don't think you're right about that. Because causation is just as much an element of a breach of contract claim as it is an unfair trade practice claim. I'm sorry, I missed that first word. Causation. Causation is both an element of a breach of contract claim and an unfair trade practice claim. No, I don't want to belabor this too much, but if you have to set a price that's commercially reasonable, and that requires honesty and fact, if you are not honest in fact at the time you set it, whether or not the other party believes you were honest or not, that doesn't mean that price muster under one view of the UCC. You still have violated honesty and fact, and maybe at that time they didn't know it. I don't think your argument is right on that point. Well, I respect that. You think they have to rely on a lie? They have to rely on a misrepresentation? I think that if they're going to allege that we misrepresented a price in a way that injured them, which is what they're saying we did when they say we breached the honesty and fact test. But if you were the only source they had, maybe they just decided to go along with it. But that's not what Mr. Conlor admitted, and he admits it on JA page 176 and 177. I said to him, Mr. Conlor, it sounds like what you want was the explanation. Adam Hall gave you an explanation. You just didn't believe it because of what you were seeing in the market. Is that right? And Mr. Conlor said yes. And so, Judge Shedd, to answer back to your question. No, no, back to my question. So your view is we could lie to them all we wanted to, and it just doesn't matter. No, sir, that's not my point. Yes, it is. Yes, it is. Why isn't it? Well, first of all. If they didn't rely on the lie, it's not relevant. Is that what you're saying? That is correct. That is correct. I don't believe we lied for all the reasons you took up with Mr. Millen. I'm not saying. No, no, no, I'm not saying. No, no, no, I'm saying your position, not what happened in this case. Your position is under the UCC, we can lie all we want to, and as long as they don't ever find out about it, we're home free. No, sir, not that last part. My position is if there is a lie by a seller, but the buyer doesn't believe it, then by definition there has been no reliance on that lie, and the lie cannot have caused the buyer any injury. It could have. I'm sorry? It could have. It could have kept him in a contract he had a right to get out of immediately. But if he. No, no, wait. Because if the price. You want to talk about contract principles. If the price you set is not commercially reasonable, then hypothetically you violated the contract at that point, haven't you? Correct. Yes. One. One. And the other side would have the right to end that contract at that point if it's a material breach, right? Correct. If they don't know about it, then they are foregoing a right because they don't know about it. So they wouldn't have to rely on the lie to go along with the contract. If they don't know about it, that's the critical part. But Mr. Conroy did know about it, and if he thought we had lied and knew about it yet chose to remain in the contract, it's not our lie that kept him in the contract. It's his own decision to remain there. Again, the lie has to cause some injury. Right. It could be that he had no other, almost had no other option for it. I'm just saying. I'm not making the argument for him, number one. And number two, if he'd known it wasn't true at the time, he could have been negotiated with you on the price. He could have. But, Your Honor, what I would submit is his testimony shows he knew it wasn't true at the time. He admitted he knew it wasn't true at the time, yet he chose to stay in the contract for whatever reason. They didn't terminate at that time. He admits he didn't believe us. He admits he thought we weren't telling the truth. He stayed in the contract anyway. I'm not saying lying is good or okay under the UCC by any means. I'm just saying if you want to bring a lawsuit based on breach of contract because someone has lied to you, you have to show injury from that lie. What about the second area I questioned, which is after material breach, there's no right to sue on the contract? Yes, sir. That's not open-ended as it sounds, is it? You mean the question you took up with Mr. Mellon right at the end of his argument? Yeah. In other words, is Virginia law that once there's a material breach, there can be no further suit by that breaching party on the contract? Yes, sir. I think the law is settled on that. In the Tanberg case, Judge Ellis reviewed all the case law on those issues at length, this very specific issue. No, the Virginia cases, aren't those suits for non-performance? The contract law generally, as a general rule is, a material breaching party has no right to sue for the other side not performing the contract. That's just black leather contract law. But to say that once there's a material breach, and then the parties continue only their contract positions, and there's no right to sue for subsequent breaches, that would be an extraordinary position, wouldn't it? I don't believe so, Judge, because I believe, as Judge Ellis explained in his review of the cases, and let me make sure, first of all, I clearly understand the distinction you're drawing. You're drawing a distinction between a suit over just a party who says, I'm not doing anything more, non-performance, and a party that actually does it. Because you breached it, you breached it, you cannot now sue me because I won't perform, that's black leather law. Correct, no question about that. You're asking whether Virginia law goes one step further and says, not only can you not sue for somebody saying, no, I'm not performing, can you also not sue for somebody who actively breaches? And the parties continue on in the contracting situation after the material breach. That would be extraordinary. I don't believe so, Judge. I believe Judge Ellis reviewed those at great length and came to this conclusion, and he cited this case from the Supreme Court. I read it. I read it. I read what he wrote. I still think it would be extraordinary. Well, it may be extraordinary, but it is the law of Virginia. I believe it's the law of Virginia. And he cites the Supreme Court of Virginia that says, the party who commits the first breach of contract is not entitled to enforce it or to maintain an action thereon. The enforce it part goes to non-performance or to maintain an action thereon, which I submit goes to breach, against the non-breaching part. No, I don't have the second part of this. Against the other part for a subsequent failure to perform. So what do you do in a situation like this where there is a material breach, but both parties continue to operate under the terms of the contract, and then one breaches or violates the terms of the contract? Is the non-breaching party subsequently, I'm talking about, without remedy? That's the law in Virginia. By non-breaching party, in this instance, you would mean Bayer. If Bayer breaches first and then the parties continue. I mean, the material breacher, who then, after the material breach, continues on in the contract. Both parties know there's been a material breach. You continue on in the contract. The non-material breacher in that first instance, they don't have open season to do whatever they want to with no ramifications. Or you say that's what Virginia allows. I believe, as Judge Ellis concluded, that is what Virginia law says. It's two different theories, Your Honor. It's a waiver theory versus an unclean hands theory. Mr. Millen is arguing what I'll call a waiver theory. That if the party stays in the contract, despite a breach by the first party, they waive that breach and continue to perform, and can't then say you can't do anything about it. Virginia law, I'd submit, follows more of an unclean hands view that says, if you breach first, we don't want to hear you when you say the other side later breaches. Wait, wait, wait. Let me give you a hypothetical. It's hard for me to believe I have such respect for Virginia Supreme Court, and quite frankly, some of my colleagues who've come from there. But your theory is Virginia believes this. That if the contract in this case read that on January 1st, you have to deliver to us $10 million for these chemicals, and we'll give them to you through the course of the year. Your theory is, had the other side breached on November 1st, material breaching going out to the other source, they still would have had to pay you $10 million, whatever I said. And you would not have to ever supply them with any chemicals, and they could do nothing about it? That cannot be. You are now telling us that the learned lawyer that you are, that you say that is the law, that Virginia allows for the party that got $10 million under the contract and did nothing and refuses to do anything. They keep the money and everybody's happy in Virginia? Part of being a lawyer, Judge, is accepting the extreme cases, and I think that's the rule that has been announced by the courts of Virginia, as explained by Judge Ellis, and it applies even in extreme cases. Hard facts make bad law, I know, I get that. And you think if that was argued to the Virginia Supreme Court, that's why they would say, litigants, wow, that's a tough thing. Well, they may say that, Your Honor, but in doing so, I think they'd be overruling their prior jurisprudence, which is settled. And I would note this last point, as I'm about out of time, that's not the situation we have here, because we didn't know they had breached until this lawsuit got started. We found out in discovery that they had gone and bought chemicals from Kim Torres. So this is not a situation in which we knew about their breach and voluntarily continued performing. This is a situation in which we didn't know about it and learned about it only after this lawsuit was filed. I thought your answer to me would be, and I just haven't looked at this closely enough, my gosh, the state of Virginia, if you are right, which is shocking to me, if you're right, on that point I mean, but it seems to me that there had to be something else, like unjust enrichment or some other remedy. It just cannot be that you could take $10 million under a contract, which you knew you were getting paid to perform, and you don't perform it, and that's just too bad. That's exactly the tension, I believe, Your Honor, that Judge Ellis was exploring in these cases. I realize there are certain fact patterns in which it would seem to produce an unjust result. And the law evolves when unjust results come to the court's attention, and occasionally they retreat from their jurisprudence. But in this particular case, again, I know I keep saying it, but I believe it's settled in his thorough opinion, Judge Ellis' opinion. Is there a case in Virginia that the Supreme Court has decided on facts, like I've said, which is a material breach followed by a continuation of the contract, and somebody then sues, and they say, sorry, you materially breached, you may not ever sue again on this contract. There's no fact situation like that. I believe that's the Horton case, I believe. Now, I have a little bit of hesitation there, I don't want to mislead the court, but I believe in the Horton case, which started all of this, one party breached first, and then was sued by her husband. Mrs. Horton breached first, was sued by her husband, then she claimed he committed several breaches later, I believe that's the case, and the court said, no, Mrs. Horton, you committed a material breach first, you cannot be heard. That was definitely the case in Tanberg, the Judge Ellis' opinion, not a Supreme Court of Virginia case, mind you, but definitely the case in Tanberg, in which the court said because the defendant breached in March of 99, he could not sue the plaintiffs for the plaintiff's subsequent breaches after March of 99, and Judge Ellis believed he was on firm ground there because of the repeated rulings from the Supreme Court of Virginia on this issue. What do you think about certification on these two questions that I've been pushing you on? If you're comfortable you got it right, you'll be glad to have them endorse you, won't you? Well, that's a very good point, Your Honor, so I'm certainly not afraid of certification and don't have a real strong view on it. In terms of, I do think, as the Tanberg case illustrates, there's a good amount of law on this prior material breach question, not as much on the UCC question, to be sure, because that American trading case is the only time Virginia has spoken and then only sort of indicative because it was a sewer services case that was not a UCC case. So perhaps certification is more appropriate on that point, especially because there are a number of different approaches the court has taken. If I may speak briefly to unfair trade practices, which I don't think has come up yet in any of this. I don't have any further questions. Then I won't. Any other questions from Judge Mons or Judge Gregory? Well, if you can do so within a minute or so, go ahead. I would just make the big overall point that this just isn't an unfair trade practice case. This is a contract dispute between two very sophisticated parties. The courts and North Carolina law in this diversity case governs the unfair trade practice claim, and North Carolina law has made it clear time and again that unfair trade practice claims should not be entertained in contract cases except under the most egregious and aggravating circumstances. That's the Broussard case and various others from this court. So for that reason, we believe even if they're right about the merits and the issues about causation, this is just not a case where the unfair trade practice act has any play. Thank you. Thank you, counsel. Mr. Millen, you have time. Thank you, Your Honor. And to pick up the point that Judge Shedd was making there with respect to the continuing performance, if you read the Virginia cases, I think that it's exactly correct that what they say is your non-performance will be excused if another party has committed a prior material breach. I think the Virginia cases also very clearly say that you would be entitled to rescission in that circumstance. The question, I do not believe, has been grappled with what happens when the parties continue, and clearly the circumstance that Judge Shedd laid out or the circumstance, for example, where the last delivery of, let's say, 14 tons of methyl bromide instead of being methyl bromide or talcum powder, is the question does Baer have a remedy there? Of course Baer has a remedy there. And the reason Baer has a remedy there is this cannot be disclaimed. And I'll circle back to this issue of honesty in fact. First of all, honesty in fact is not a reliance requirement in the context of breach of contract. That's number one. Secondly, under the UCC, honesty in fact doesn't apply to anyone. If I buy a used car from my neighbor, honesty in fact doesn't apply. Honesty in fact only applies to merchants in the trade, which Albemarle conceitedly is here. Now, circling back all the way to the very beginning in Judge Shedd's question about could there be a situation where notwithstanding lack of honesty in fact and some horrible series of lies, and yet the price is commercially reasonable, could that not be a violation? I think arguably there could be a circumstance where all the lies could be irrelevant in the circumstances potentially of what the UCC in comment three calls the normal case where what was happening, and this is all the cases that he was talking about, including that Texas Supreme Court case. What was happening there is the court saying you've got a posted price, your list price. You're making it available to everyone in a non-discriminatory manner, number two. And number three, in every single one of those cases, not only the Texas case, but the Ohio case, the Georgia case, and the South Carolina case, Havrid, from this court, in every single one of those cases what they said is there is evidence that the range of prices that you are charging for your wholesale gasoline is within the range of what other refiners are charging. So in that circumstance, if you could hit all three of those, lack of honesty in fact could conceivably be a non-factor. That's not this case. And the reason that's not this case is because not only do we not have a situation where they can say their price for methyl bromide is within the range of what others are charging, it's actually well outside the range of what others are charging. So we would contend that under those circumstances we're clearly in a situation where you add the lack of honesty in fact to the circumstances regarding the pricing, to the disputes concerning the rationale for the pricing, to the disputes concerning the margin, which is a dispute that actually comes up within the claim and testimony of Albemarle itself, where one witness says it was a 20% margin before and a 60% margin after, and then that's contradicted by a later created document where they say, no, it was about 60% at both times. That's another disputed fact. So all of these things go to the issue of there are many disputed facts here, and the reason that I'll just, with the last bit of time I have here, I want to talk briefly about this issue of the materiality of the breach. The reason we know that what Baer was accused of here, which is buying from Chemtula without first offering to Albemarle at the lower price, the reason we know that's not a material breach is because the district court dismissed it at summary judgment. That was their claim. Now, Horton does say there can be circumstances in which there are no damages and it could still be a material breach. However, Virginia law is very clear on this. In order to be a material breach with no damages, and this is Horton and other cases as well, it has to go to something that is so central to the contract. Sometimes the Virginia cases say it goes to the root of the contract. You cannot contend that it went to the root of the contract when what Baer is accused of doing here in buying from Chemtula without offering the same price first to Albemarle, what they are accused of is not giving Albemarle the chance to sell to Baer at what they said was a loss. That can't be material. So we don't think there's a prior material breach. My time is up. I'd be happy to answer any questions the court has. All right. Nothing further. Thank you, counsel. We will ask the clerk to adjourn the court for the day, and then we will come down and greet counsel. This honorable court stays adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Roger L. Gregory, Diana Gribbon Motz, Dennis W. Shedd